UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------x
:
UNITED STATES OF AMERICA        :   Criminal No. 3:22-cr-00198-OAW
:
v.                              :
:
MICHAEL NASTU                   :
:   December 22, 2022
---------------------------------------------------------x

# DEFENDANT'S SENTENCING MEMORANDUM

For the reasons that follow, the Court should impose a sentence of not more than 18 months, reflecting the bottom of the 18 – 24-month range the parties agree is appropriate. Michael Nastu is 63 years old. Though his life's story bears the marks of a significant trauma in his adolescence, he has led a productive and law-abiding life. The offense in this case, committed while Mr. Nastu was battling alcoholism and marijuana addiction while isolated during the height of the COVID-19 pandemic, marks a substantial but singular departure from that life course. Importantly, Michael has taken this case as an opportunity to critically evaluate his life, and he has since made significant progress in mental health and addiction treatment not only to ensure that the conduct in this case never recurs, but also to grow past the traumas that have limited his life in other ways. In light of these factors, a sentence of 18 months, coupled with the serious collateral consequences of a felony conviction as well as likely sex offender registration, is amply sufficient to achieve the goals of sentencing here.

1

## BACKGROUND AND HISTORY

For over 35 years, from 1979 to 2015, Michael Nastu was a beloved waiter at Mario's Restaurant in Westport—a stretch long enough that he recalls serving young couples early in his career and then those couples' grown children in later years (often having seen them grow through childhood and adolescence). This exceptionally long stint in a single job reflects the broader trends of Michael's life as a well loved and loving fixture in the lives of others but somehow also stuck in place, abiding but perhaps not truly flourishing.

Since his arrest in this case, Michael for the first time has been able to take advantage of therapeutic tools and resources to reflect on his life, and he has come to see this aspect of his life as driven by a nearly lifelong reliance on marijuana and alcohol, substances he turned to beginning at a young age to blunt feelings associated with significant traumas he experienced as an adolescent. These are discussed at greater length in the mental health evaluation by Dr. Wendy Levy, submitted separately under seal as **Exhibit 1**.

Despite the trauma and subsequent substance use, which by Michael's teens was significant enough to interfere with high school sports and then with his academic performance in college, Michael found stability and purpose both in his professional work as a server and in service to his friends and family. Of particular note on the latter front, as an adult Michael assumed the role of primary caregiver for his mother as she aged. Michael's brother Gregory recalls in the letter attached as **Exhibit 2** that "Michael took care of our mother for ten years, before she passed away in 2015. He took her to: doctor appointments, did laundry, changed the sheets on the beds, cleaned the house, went food shopping. He did everything he could to help her." Michael's brother Gary adds in his letter that "In addition to my mother Michael also helped and visited our 93 yr. old god Mother while she was dealing with her own health issue."

**Exhibit 3**. More broadly, Michael's cousin (a retired FBI agent) comments that Michael "has always been a hard worker and always been a person who has been true to his words. He has always been willing to go out of his way to help someone in need." **Exhibit 4**.

In 2015, Michael's mother died, and the same family who saw how much he cared for his mother also observed the aftershocks of her passing. Another cousin writes

> When Michael's mom got sick he changed his life to help his mother, he started working locally, loved taking care of her, and keeping her company so she wouldn't be alone. Micheal would consistently bring to all of her doctor appointments; even when his mother became frail and had to go from a walker to a wheelchair he always provided her the best care. When his mother passed away, Michael quickly struggled with the reality of his mother being gone with drugs and alcohol abuse, he started to smoke pot more and drink heavily. We all tried to help him as best as we could but his life was in shambles[.]

**Exhibit 5**.

Compounding the pain of losing his mother, in this time Michael also experienced multiple other losses. Michael's brother Gregory recalls that after their mothers' death, "Michael went into deep depression. Soon after, he lost two of his best friends. They were all a part of the church; as alterboys, and playing on church basketball league." **Exhibit 2**. Compounding these personal losses, that same year, Mario's—the restaurant that had been Michael's professional home for three and a half decades—closed its doors.

Despite these losses, and what Michael's family recognized as a depressive spiral, Michael soldiered on. He got a small condo on his own. Though now in his late 50s, he found new work, first as a driver and then as a cafeteria worker. For a time his drinking even diminished, as he no longer had the social impulse to drink that had been an aspect of his restaurant work. And he remained an integral part of the local community, many members of whom have submitted letters, which are collected as **Exhibit 6**.

Then the pandemic hit. No longer working, and isolated from community ties, Michael slipped deeper than ever before into the haze of substance use, doubling his marijuana consumption and drinking heavily on a daily basis. In the midst of this particularly dark time, Michael committed the offense in this case. Looking back, Michael writes in his own letter, attached as **Exhibit 7**, that

> Since I have been sober and in therapy, I realize how wrong and improper and irresponsible and how inappropriate it was and I realize how harmful it was and how very harmful it is to send obscene material to a minor. I take full responsibility and I regret doing it. I am very sorry and I apologize and I will never do it again. I am ashamed of myself for my actions. I am disgusted by my behavior and I promise that I will never do anything like that again.

As Michael alludes to in this passage, since the offense in this case, he has for the first time in his life had access to therapy and substance abuse treatment, and he has built a strong relationship with his clinicians at MAAS. Michael goes on his letter to describe what this has meant for him:

> My therapy is helping me through my problems and has helped me to understand what I have done and I understand that it was very harmful for me to send obscene material to a minor. My therapy is helping me to heal, it's helping me to get better, it's helping me to learn and understand the things that happened to me when I was twelve years old and continued in my early teenage years, that has haunted me and plagued me and bothered me all my life , and my therapy is helping me to repent, to correct my fault, my wrongdoing, and my therapy is helping me to change my life, and to be a different person, a better person, a changed person. A person who is being put back on the right path of a righteous life . And I will stay on this path forever.

**Exhibit 7**. A letter from one of the MAAS clinicians, attached as **Exhibit 8**, confirms that Mr. Nastu has not only completed substance abuse treatment but has "independently requested to remain in treatment for ongoing support" and has "put great thought and time into creating" his relapse prevention plan.

Members of Mr. Nastu's family have likewise seen his growth. His brother Gregory notes that "Since I am the one who visits and sees Michael more than anyone else I have noticed and

4

seen significant changes in Michael since he stopped using drugs and alcohol. The therapy sessions and programs have made a big impact on him." **Exhibit 2**. A friend and co-worker for 37 years similarly shares that

> It appears to me that he is on the right track as he works with his counselors and stays completely focused on his sobriety. Through these changes in his day-to-day life, he seems to have reverted back to his "true self". I have observed this change in him. He has shared with me that he feels strongly that his counseling sessions give him both the perspective and the confidence that he can again be the solid, upstanding person that he once was.

**Exhibit 9**.

A final letter, from a person who has known Michael only one year, his manager at Panera Bread, offers this present insight into the upstanding person that Michael is today:

> While Michael has worked at Panera Bread I can say in earnest that he has been a shining light in our café. The team has grown to love him, the customers return for his boisterous greetings and witty humor, and the management team agrees that he is essential to our team in Westport. Not only has Michael been consistently the most reliable member of the team, but he reports to work early and with a friendly attitude, which is something I hope all of my employees come to learn from him. Not once has he let his troubles cloud his ability to come in, smile, and get the work done. He is phenomenal with our guests and takes it upon himself to make every moment perfect for them, going above and beyond anything I can ask of him. I've seen him go out of his way on more than one occasion to offer the guests a substitution when he notices the disappointment on their face when we've run out of baguettes. He is compassionate, has a huge heart, and he treats the customers like I imagine he would treat a guest in his own home. Not only is he great with the guests, but he holds his fellow employees accountable to getting the work done and not taking any shortcuts. He's the first one to suggest a cleaning task whenever he and the team have down time and it's clear that he understands that food safety is our most important job in the café. His diligence and focus are not only present inside the café but outside of the café with his appointments and therapy too.
> Judge Omar Williams, I sincerely hope this letter serves as a glimpse into the good nature of Michael Nastu. He is a wonderful employee, a spirited individual, and, I believe, a good man. He is not without fault, but nor are any of us. He has, as far as I can tell, admitted his crimes, owned his role in them, and started his work to put it all behind him.

**Exhibit 10**.

### THE JSIN DATA PRESENTED IN THE PSR MISLEADINGLY INFLATES AVERAGE SENTENCE LENGTH

The PSR in this case contains a section purporting to present data about typical sentences across the country in similar cases. The PSR states that, applying the JSIN tool "using Guideline §2G3.1 and contemplating a Total Offense Level of 15 and a Criminal History Category I, the average length of imprisonment imposed was 16 months and the median length of imprisonment imposed was 12 months." PSR ¶ 83. Even as presented in the PSR, this data shows that the proposed 18-month sentence in this case is by no means a conservative sentence for offenses covered by this guideline. But this case also illustrates some of the (many) significant issues with JSIN and the presentation of its data outputs in the PSR. Perhaps most significant, PSR data report deliberately excludes all cases in which no prison sentence was imposed. Publicly available JSIN data shows that full 31% of cases involved no prison time. The PSR account thus excludes nearly a third of cases. Accounting for the full picture of cases, the average sentence length drops from 16 months to 13 months, a discrepancy of nearly 20%. Analytically, this is egregious. However, since the agreed-upon sentence here is by any measure in excess of the JSIN averages, a fuller critique of this new aspect of the PSR does not appear necessary.

### THE 3553(A) FACTORS SUPPORT THE PROPOSED SENTENCE

The Guidelines range in this case is 18 - 24 months.  While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines, it is not bound by that range. What the Court is bound by is the dictate of 18 U.S.C. § 3553(a) that the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. Consequently, as the Second Circuit explained in *United States v. Ministro-Tapia*,

6

470 F.3d 137 (2d Cir. 2006), if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id*. at 142 (where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence). As discussed below, a sentence of 18 months is amply sufficient to achieve the goals of sentencing here.

### Mr. Nastu's History and Character Support the Proposed Sentence.

As a statistical matter, "Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism." *United States v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass. Jan. 18, 2007) (Gertner, J.). (citing United States Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, 15 (Jan. 4, 2005), http//www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf ). That Mr. Nastu has gone through 63 years of life with no prior criminal record bodes particularly well for his ability to return to the community as what he has until this offense always been: a law-abiding and productive citizen. (Indeed, despite approaching retirement age, during the pendency of this case Michael has worked hard to secure and maintain employment, ceasing work only recently due to the closing of the restaurant franchise where he worked.)

At 63, Michael's age is also a relevant circumstance that further diminishes his likelihood of recidivism. As a study by the United States Sentencing Commission in 2017 shows, the

rearrest rate for defendants over 60 in criminal history category I is only 11.3%, nearly 5 times lower than that of similar defendants under 30.[1]

Beyond statistics, Michael's path through life has been one, quite literally, of service. He spent decades of his life as a well-loved server at a local restaurant, a life path that perhaps fell short of Michael's true potential, but one that also never involved getting ahead at the expense of others. And even now, Michael has shown an ability and willingness to grow, to confront old demons and forge new paths. The offense in this case does not define Mr. Nastu's life to this point, but to his credit he has used his arrest as an opportunity to redefine his life going forward.

### An 18-Month Sentence Is Sufficiently Punitive.

Eighteen months in prison means something very different at 63 than it does at 36. Reflecting the reality that growing old in prison is not the same as aging in the community, the Bureau of Prisons defines the special population of "aging" inmates as anyone over 50.[2] Mr. Nastu entered this category well over a decade ago, and while he is in generally good health, he suffers from a range of conditions that even in the community, where accommodations can be made, affect his quality of life. Those problems will no doubt be more acutely felt in prison, where, by several estimates, "prisoners' physiological age averages 10 to 15 years older than their chronological age."  As a 2013 statistical analysis based on ten years' worth of data from New York State parolees has shown, "for each year served in prison, a person could expect to lose approximately 2 years of life."  Mr. Nastu's time in prison will not be without consequence.

---

[1] https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders

[2] United States Department of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015) at i. Available at https://oig.justice.gov/reports/2015/e1505.pdf.

**The Court Should Account for Collateral Consequences in Fashioning a Sentence.**

In a somewhat harsh irony, Mr. Nastu's lack of any prior criminal record makes the consequences of this conviction more severe. Because of his conduct in this case, Michael Nastu is now—and will be for the rest of his life—a convicted felon. This is a life-altering mark. As a Court in the Eastern District of New York recently outlined,

> Remarkably, there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons. Of those, federal law imposes nearly 1,200 collateral consequences for convictions generally, and nearly 300 for controlled-substances offenses. District courts have no discretion to decide whether many of these collateral consequences should apply to particular offenders. The result is a status-based regulatory scheme; by the very fact of an individual's conviction, he or she is subject to a vast array of restrictions.
>
> The range of subject matter that collateral consequences cover can be particularly disruptive to an ex-convict's efforts at rehabilitation and reintegration into society. As examples, under federal law alone, a felony conviction may render an individual ineligible for public housing, section 8 vouchers, Social Security Act benefits, supplemental nutritional benefits, student loans, the Hope Scholarship tax credit, and Legal Services Corporation representation in public-housing eviction proceedings. Moreover, in addition to the general reluctance of private employers to hire ex-convicts, felony convictions disqualify individuals from holding various positions.

*United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5 (E.D.N.Y. May 24, 2016) (footnotes omitted).[3] As the court further explained, the Second Circuit has approved of courts including consideration of these consequences in crafting an appropriate sentence under § 3553(a). *Id.* at *7 - *8; *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (stating that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence").

---

[3] The United States appealed the decision in this matter but subsequently withdrew the appeal. *See* Second Circuit Case 16-2081 Document 27.

Here, the collateral consequences of conviction are further enhanced by the fact that Mr. Nastu very likely will need to register as a sex offender, further diminishing his ability to obtain employment and to live a normal life in the community.

**A more substantial sentence is not needed to promote deterrence and respect for the law.**

As discussed above, Michael Nastu's lack of prior criminal record and affirmative work to address the factors underlying his addictive behaviors significantly diminish the need for specific deterrence. As to general deterrence, it is the fact of Mr. Nastu's punishment, not its magnitude that matters. As a 2012 review of the studies that have examined the deterrent effect of sentence severity concludes, "the vast majority of these comprehensive summaries found no convincing evidence suggesting that harsher sentences deter." Webster, Cheryl Marie, and Anthony N. Doob. "Searching for Sasquatch: Deterrence of crime through sentence severity." The Oxford Handbook on Sentencing and Corrections (2012): 173-195, at 176. Recognizing that "effective deterrence arises from certainty, not harshness, of punishment," a decision in the Eastern District of New York sensibly asks whether "our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (Weinstein, J.).

**THE PARTIES HAVE IDENTIFIED APPROPRIATE CONDITIONS OF RELEASE**

The PSR at ¶ 106 identifies a set of potential post-release conditions, which as noted in ¶ 105 "should not be construed as recommendations by the U.S. Probation Office." These conditions in some material respects depart from the conditions proposed by the parties in the plea agreement. Defendant submits that the conditions stipulated to by the parties sufficiently addresses any likely supervision needs while respecting constitutional restraints and should be imposed. Defendant objects to imposition of the conditions in ¶ 106 to the extent they depart from the parties' proposed conditions.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | THE DEFENDANT, <br> Michael Nastu |
|  | OFFICE OF THE FEDERAL DEFENDER |
| Dated: December 22, 2022 | /s/ James P. Maguire <br> James P. Maguire <br> Assistant Federal Defender <br> 265 Church Street, Suite 702 <br> New Haven, CT 06510 <br> Phone: (203) 498-4200 <br> Bar No.: ct29355 <br> Email: James_Maguire@fd.org |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 22, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                                                                                    s/ James P. Maguire
                                                                                                    James P. Maguire